**MERINOS VIESCA Y COMPANIA, Inc., v.
PAN AMERICAN PETROLEUM &
TRANSPORT CO. et al.**

No. 98.

Circuit Court of Appeals, Second Circuit.

April 6, 1936.

See, also, 49 F.(2d) 352.

Samuel A. Pleasants, of New York City (Samuel A. Pleasants, Jean Anderson Fitzsimmons, of Brooklyn, N. Y., and Howard A. Sperry and Benjamin G. Myron, both of New York City, of counsel), for appellant.

Kellogg, Emery & Inness-Brown, of New York City (Dean Emery, J. Fearon Brown, Harold Kronig, and Edward Schuster, all of New York City, of counsel), for appellees.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge.

Appellant sues to recover the value of 70 million barrels of oil taken between 1910 and 1919 from oil lands known as lot 165, Chinampa, in the canton of Tuxpan, state of Vera Cruz, Mexico.

Mrs. Cruz, a Mexican, owned the land in question. October 21, 1901, her son Adolfo Merinos, appearing as her unofficial representative, contracted with one Julvecourt to lease lot 165 for ten years, with an option of renewal for ten more years. Three others joined in executing similar leases of their lots in the same contract. The recited purpose was "in order that the lessee may exploit all the springs or deposits of crude oil or asphalt existing in those lands and so that he may explore and exploit the subsoil of the same lands and the analogous or similar material which may be found therein." Surface rights, necessary to the exploitation of the land for oil, were also given.

This Julvecourt contract was recorded in the public registry of property at Tuxpan, and since registration no effort has been made to cancel it. Merinos obligated himself to obtain, upon request of the lessee, a ratification of the contract by his principal. On November 2, 1901, Mrs. Cruz and the other landowners involved personally ratified the contract. On June 21, 1902, Mrs. Cruz appeared before a justice of the peace in Mexico and invested Adolfo Merinos with the power of attorney which is in controversy here. By that instrument Adolfo Merinos is made her agent "in order that he may lease the movable and immovable properties of the grantor in the manner that he may deem most advantageous and to rectify all the contracts had with Count Julvecourt." This power of attorney gave discretion to Merinos in regard to leasing "the movable and immovable property," and Mrs. Cruz knew that he had made the Julvecourt lease and expressly referred to it and authorized Merinos to rectify it. On July 14, 1902, Merinos, with the other Mexican lessors, appeared in person before a notary and in the presence of witnesses duly ratified the Julvecourt lease in a formal public contract inscribed in the protocol of the notary. This recited the ownership of the several lots of land, including lot 165, their areas and boundaries, and "that in these lots there are various deposits or springs of crude oil which were leased to Mr. Julvecourt on October 21, 1901 by public instrument," and further, "and the ratification which the proprietors subsequently made did not satisfy Mr. Julvecourt and besides did not specify precisely and clearly the area of the lots nor their boundaries which identify them, the appearing parties agreed to ratify the above mentioned contract of lease of October 21, 1901, in the terms set out in the present instruments in view of which they now stipulate."

The parties ratified and confirmed in its entirety the lease of 1901 in reference to lot 165. Merinos exhibited to the notary his power of attorney, and the notary incorporated into the contract the clause giving him authority to lease the movable and immovable properties of the grantor and to rectify all the contracts had with Julvecourt. The Julvecourt contract thus ratified was recorded July 23, 1902.

Julvecourt, pursuant to the right given him by the contract, assigned this lease to the Pan American Company (not a defendant) on February 6, 1903.

On June 16, 1906, Adolfo Merinos, acting under his power of attorney from Mrs. Cruz, entered into a second lease of the subsoil deposits of lot 165 for thirty years with the Pan American Company. This was so similar to the Julvecourt lease of 1901 as to be equivalent to a revision or recasting of it. Both contracts show clearly that the primary intention of the contracting parties was to give the right to exploit the subsoil deposits. The only purpose of either contract was to dedicate the land to the petroleum industry and to grant to the lessee the right, not merely to ascertain whether petroleum was present, but to take it away for its own benefit if it was found. The lease of 1906 suspended the Julvecourt contract to create a revised and rectified lease of the same general nature covering the same land for the same purposes but for a more extended period, with incidental privileges of right of way, methods of communication, and use of water amplified. The Julvecourt lease had been for ten years, continuing until October 10, 1911, with an option for ten additional years, and the 1906 lease was to ex-

tend the term to the 30th of June, 1936. It is immaterial how valid this extension of fifteen years was, since all the oil was extracted before the end of 1919.

April 2, 1907, appellee Tamiahua Petroleum Company took an assignment from the Pan American Company of "all rights of every nature and description which the Pan American Company then had or might have in and to these properties by reason of antecedent contracts, or otherwise." Thus the Tamiahua Company became the cessionnaire of the contract of 1906 and also of any rights which the Pan American Company might have under the Julvecourt contract, if the 1906 lease proved invalid.

Lot 165 proved to be valuable, and seventy million barrels of oil were brought in before salt water appeared in 1919. Appellant's title is claimed through mesne assignments from Geronimo Merinos, sole and universal heir of Mrs. Cruz, who died December 2, 1919. In November, 1922, Merinos organized a partnership in Mexico where it lost a suit based on this claim. The partnership assigned its claim to this appellant, a New York corporation.

The appellant argues that the 1906 contract had a dual aspect and as such was valid as a lease of the surface and void as a grant to extract petroleum. It sues on a theory of conversion and upon the law of Vera Cruz obligating a lessee to return the leased property in the form in which it was received. It must establish, to support either theory, that the oil could be removed and sold neither under the Julvecourt contract nor within the rights given in 1906. The argument is that the power of attorney given by Mrs. Cruz to Adolfo Merinos covered a lease of surface rights but did not authorize the sale of oil extracted from the subsoil. The foreign law is alleged to be that no lease gives the right to subsurface exploitation, but that this is covered only by a contract of sale; that an agent's power to make such a contract is not embraced in an authority to lease, but that only a special power of attorney is sufficient to give such authority. The 1906 contract is sought to be upheld as 'a lease of surface right only, effectually canceling the Julvecourt contract and establishing the lessee's liability to return the leased property undiminished. The appellees, other than the Tamiahua Company, are joined as participants and as Tamiahua's undisclosed principals.

The trial court held that it was for the court to determine whether under the foreign law rights to a subsoil deposit of petroleum can be transferred by lease so that the lessee can thereby acquire title to the oil with the right to remove it, as well as whether or not under that law Merinos possessed the necessary authority so to transfer by his power of attorney.

The construction of an ordinary written contract, unambiguous upon its face, presents a question for the court and not the jury. Goddard v. Foster, 17 Wall. (84 U.S.) 123, 21 L.Ed. 589; Hamilton v. Liverpool & Ins. Co., 136 U.S. 242, 10 S. Ct. 945, 34 L.Ed. 419; Monagas v. Fox Film Corporation, 46 F.(2d) 877 (C.C.A.1); Sterling Homes Co. v. Stamford Water Co., 79 F.(2d) 607 (C.C.A.2). The meaning of a written power of attorney is ordinarily a question for the court where there is no circumstance shown by evidence which requires its submission to the jury. Thiel Detective Service Co. v. McClure, 142 F. 952, 4 L.R.A.(N.S.) 843 (C.C.A.6).

The appellant, however, argues that the testimony here as to foreign law shows a conflict as to the meaning of the authority to lease contained in the power of attorney which should have been submitted to the jury. Foreign statutes (Code enactments of Vera Cruz and Mexico), as well as testimony of legal experts and decisions of Mexico's highest court, were offered in support of the appellant's contention as to the construction of these instruments.

The courts do not take judicial notice of the law of foreign lands. It must be proved, but this does not mean that the opinion of a witness will control the judgment of a judge except to the extent that it is a reasonable inference from statute or from precedent or from the implications of a legal concept such as a contract or testament or juristic personality. Petrogradsky M. K. Bank v. National City Bank, 253 N.Y. 23, 34, 170 N.E. 479. It is the duty of the trial judge to use his own judgment and find the meaning of the foreign law as he would if the meaning to be ascertained were that of a deed or an agreement. The meaning of a foreign statute is for the court notwithstanding the conflict of testimony of experts. Scheer v. Rockne Motors Corporation, 68 F.(2d) 942 (C.C.A.2). In Eastern Bldg. & Loan Ass'n v. Williamson, 189 U.S. 122, 126, 127, 23 S.Ct. 527, 529, 47 L.Ed. 735, the rule is stated to be that, "While statutes and deci-

sions of other states are facts to be proved, yet when proved their construction and meaning are for the consideration and judgment of the courts in which they have been proved. Nor is the rule changed by the testimony given in the deposition of defendant's counsel, for, as he states, his opinion is based on the statutes, the articles of incorporation, and the decisions admitted in evidence, together with similar decisions of other states under like statutes, articles of incorporation, and by-laws. No witness can conclude a court by his opinion of the construction and meaning of statutes and decisions already in evidence. * * * The duty of the court to construe and decide remains the same." See, Finney v. Guy, 189 U.S. 335, 342, 23 S.Ct. 558, 47 L.Ed. 839, City of Jamestown v. Pennsylvania Gas Co., 1 F.(2d) 871, 883 (C.C.A.2).

█ The 1906 lease reaffirming the tenancy for a continued period and surrendering the Julvecourt 1901 lease clearly intended to convey the right to extract petroleum. Its paramount intention is found in the language employed. It was executed with due formality under the Mexican laws and recorded in the public registry. The testimony of experts to the effect that this contract is separable into a lease of the surface and one of sale of the subsoil reserves is unsupported by authority. Their opinion as to separability is based on the provisions of the Civil Code of Vera Cruz (articles 2228, 2230, and 2380 of the Civil Code, Federal District) that the principal is bound by the acts of the agent within his authority and the acts performed by an agent beyond the scope of his powers are void. They refer to the Jose Maria Lujan Case in the court of last resort of the Federal District, where a third party, who had dealt with the agent, enforced against the latter's principal a separable and valid part of the contract which the agent had celebrated with the third party, plaintiff. The case is not in point, since here the appellant, as principal, seeks to hold the third party to such portions of the agent's agreement as the principal deems advantageous to adopt, and asks damages of the third party because of the invalidity of certain other aspects of the contract made by the agent. Moreover, the Lujan contract was readily capable of separation. It would be completely illogical to divide the contract in the instant case. This is best portrayed by reading the evidence of the appellant's experts. They said substantially that, although the lease granted the right to use the surface, extract the oil, and build a transportation pipe line, no valid right to sell oil or take it away was given, but that the lessor could refuse to sell the oil to the lessee and could sell it to a third party. The contract cannot be so construed as to sever and hold valid the privileges given as incidental to the production and sale of oil by the lessee, while holding invalid the principal privilege of the contract, the right to take off oil.

█ Appellant, seeking to establish that the Julvecourt lease should be excluded from consideration here, calls attention to the first paragraph of the 1907 assignment by Pan American to Tamiahua Company, wherein there are assigned all rights in the various groups of contracts, including the 1906 contract, from which it appears that the previous lease to Julvecourt had then been surrendered up and canceled. But the 1907 assignment continues on to evidence the intention of the contracting parties that the assignee should be vested with all rights and properties of the assignor, whether contractual or otherwise; that is, it should be protected against all contingencies, including the possibility that the cancellation of the Julvecourt lease in 1906 might be ineffective. The 1907 assignment places the Tamiahua in the position of the Pan American, and it has all the rights granted by the Julvecourt lease. This was an effective grant of the right to remove the oil.

In this view, the plaintiff's case collapses without the possibility of aid by amendment. The dismissal was proper, and the decision is affirmed.