**FIRST NATIONAL CITY BANK,**
Appellant,

v.

**COMPANIA de AGUACEROS, S. A.,**
Appellee.

No. 24137.

United States Court of Appeals
Fifth Circuit.

March 11, 1968.

Rehearing Denied March 27, 1968.

Richard B. Montgomery, Jr., New Orleans, La., L. S. Carrington, Balboa, Canal Zone, Arnold Y. Claman, New York City, Guillermo Jurado, Republic of Panama, Bigham, Englar, Jones & Houston, New York City, Montgomery, Barnett, Brown & Read, New Orleans, La., for appellant, First National City Bank.

Henry L. Newell, Balboa, Canal Zone, Harry McCall, Jr., Gibbons Burke, Chaffe, McCall, Phillips, Burke, Toler & Hopkins, New Orleans, La., for appellee, Compania de Aguaceros, S.A.

Before RIVES, GOLDBERG and AINSWORTH, Circuit Judges.

GOLDBERG, Circuit Judge:

This case concerns the liability vel non of the First National City Bank of New York (Bank) for having cashed forged checks of the Compania de Aguaceros, S. A., (Depositor). The villainous artful forger, Carlos Echeverria, has clouded the equities between the two protagonists not only by his consummate calligraphic talents but also by his position as the Depositor's agent and auditor in Panama. The district court below discarded a relevant Panamanian statute as being vague and inconclusive, found the proximate cause of Echeverria's success to

be the Bank's negligence, and ruled for the Depositor. Compania de Aguaceros, S.A. v. First National City Bank, D.C. C.Z.1966, 256 F.Supp. 658. We find unequivocal and controlling sustance in said statute and reverse.

The Depositor was a Panamanian corporation engaged in the sale of various airlines and aircraft throughout Latin America. Although the Depositor maintained a checking account with the Bank's Panamanian branch, Joseph M. Silverthorne, who was the Depositor's organizer and treasurer, and who was the only executive authorized to sign checks on the Panamanian Bank, resided in Tegucigalpa, Honduras. Panamanian law required the Depositor to maintain a resident agent in Panama, and Silverthorne engaged the auditing firm of Farca, S.A. (Farcasa). In 1962 Echeverria bought out the owner of Farcasa and thus placed himself in the position of trust from which he later gamed his gains.

The nine forged checks on the Depositor's account totaled $44,000 and covered the period from October 11, 1963, to February 25, 1964. Each check was returned by the Bank, with the statement for the month in which it was paid, on or about the first of the following month. However, because Farcasa received the canceled checks and statement, Silverthorne remained an innocent abroad and no protest was made prior to March 20, 1964.

On March 19, 1964, Silverthorne returned to Panama, having been absent since October 29, 1963. He went to the Bank to establish a letter of credit and, while there, discovered that the balance in his company's account was substantially lower than it should have been. Because Echeverria's forgeries were skillfully done, Silverthorne was unable to determine immediately which checks he himself had not signed. With the Bank's help, however, he did trace the forged checks to Echeverria. According to the Bank, Echeverria was less artful at the casino than he was in the auditor's office, and so the two victims of the fraud must contest the ultimate loss.

At trial both parties stipulated the existence of the following three Panamanian statutes:

Article 989 of the Panama Commercial Code:

"Article 989.—Banks are required to furnish their customers their accounts current at least eight days after the end of each quarter or liquidation period agreed upon, requesting their written conformity thereof, and the latter, or any comments that may be in order with respect thereto, must be presented within five days.

"Should a customer fail to reply within said period, his account will be held as admitted and the debit or credit balance shall be definitive as of the date of such account."

Article 23 of the Negotiable Instruments Law of Panama:

"Article 23.—When a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party, against whom it is sought to enforce such right, is precluded from setting up the forgery or want of authority."

Article 9 of the Civil Code of Panama:

"Article 9.—When the meaning of the law is clear, its literal content shall not be discarded under pretext of questioning its true spirit or intention. However, for the purpose of interpreting any obscure expression of law it is permissible to have recourse to the intention or spirit clearly manifested in the law itself or in the trustworthy history of its institution."

The trial judge, in his conclusions of law, found: "5. Article 989 is ambiguous and needs interpretation for its exact meaning cannot be determined from its language." 256 F.Supp. at 663. Then, while reviewing the testimony of three expert witnesses, he concluded: "6. The experts are divided on the effect that is given in Panama to the provisions of Article 989 but it seems that the proper interpretation is that it is not peremptory and establishes only a prima facie situation which is subject to rebuttal." 256 F.Supp. at 663. In the remainder of his opinion the trial judge exculpated Silverthorne and placed the determinative blame on the Bank. He awarded to the Depositor the sum of $44,000 plus interest from March 20, 1964.

We will not review the trial court's finding of negligence because we find that Panamanian Article 989 clearly precludes the Depositor's recovery.

## I. Panamanian Law, Question of Law or Question of Fact?

This first issue, a procedural one, is brought to light by the Depositor's brief. The first sentence of that brief begins, "This case involves several questions, all of them only of fact * * *" and concludes by quoting the "clearly erroneous" rule of Fed.R.Civ.P. 52(a). Further in the brief the following conclusion is reached:

"We, therefore, submit that the trial court found as a fact the proper interpretation of foreign law—and, of course, it is a fundamental proposition that foreign law is a question of fact in the trial court."

Although we find no direct attack on this "fundamental proposition" in the Bank's brief, we refer both parties to Rule 44.1 of the Federal Rules of Civil Procedure. That Rule reads as follows:

"Rule 44.1 Determination of Foreign Law

A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under Rule 43. *The court's determination shall be treated as a ruling on a question of law.* Added Feb. 28, 1966, eff. July 1, 1966." 28 U.S.C.A.

Rule 44.1 (1967 Supp.) (Emphasis added.)

The Notes of Advisory Committee on Rules add:

"Under the third sentence, the court's determination of an issue of foreign law is to be treated as a ruling on a question of 'law,' not 'fact,' so that appellate review will not be narrowly confined by the 'clearly erroneous' standard of Rule 52(a). Cf. Uniform Judicial Notice of Foreign Law Act § 3; Note, 72 Harv.L.Rev. 318 (1958)." 28 U.S.C.A. Rule 44.1.

Prior to July 1, 1966, although our Court had accepted the common law classification of foreign law as an issue of fact,[1] we had consistently recognized the hybrid nature of such a classification. Thus, the "clearly erroneous" rule was often ignored on review especially when the relevant foreign statutes were available in English.[2] Moreover, the responsibility of interpreting foreign statutes at trial was given to the judge rather than to the jury.[3] Further reconciliation of the "fact" label with the predominantly "law" application has been made unnecessary by the functional approach of Rule 44.1. Regardless of the special procedures of proof listed in Rule 44.1, without doubt one purpose of the Rule is the relief of foreign law schizophrenia by the recognition of such law *as law.*

An exhaustive analysis, past and present, of determinations of foreign law can be found in Miller, "Federal Rule 44.1 and the 'Fact' Approach to Determining Foreign Law; Death Knell for a Die-Hard Doctrine," 65 Mich.L.Rev. 613–750 (1967). See also Kaplan, "Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (II)," 81 Harvard L.Rev. 591, 613–17 (1968).

Litigation in this case began on November 30, 1964, well before the promulgation or the effective date of Rule 44.1. However, the proceedings continued until July 5, 1966, after the Rule's effective

---

1. Mexican Nat. R. R. Co. v. Slater, 5 Cir. 1902, 115 F. 593, 605–606, affirmed under reverse title, 1904, 194 U.S. 120, 121, 24 S.Ct. 581, 48 L.Ed. 900; Shapleigh v. Mier, 5 Cir. 1936, 83 F.2d 673, 676; Liechti v. Roche, 5 Cir. 1952, 198 F.2d 174, 176; Burt v. Isthmus Dev. Co., 5 Cir. 1955, 218 F.2d 353, 357, cert. den., 349 U.S. 922, 75 S.Ct. 661, 99 L.Ed. 1254; Symonette Shipyards, Ltd. v. Clark, 5 Cir. 1966, 365 F.2d 464, 468, cert. den., 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625, (fn. 5, giving a qualified acceptance). See also Walton v. Arabian American Oil Co., 2 Cir. 1956, 233 F.2d 541, 543–544, cert. den., 352 U.S. 872, 77 S.Ct. 97, 1 L.Ed.2d 77 (cases cited in fn. 6 and text accompanying such footnote); Miller, "Federal Rule 44.1 and the 'Fact' Approach to Determining Foreign Law: Death Knell for a Die-Hard Doctrine," 65 Mich.L.Rev. 613, 688–92 (1967).

2. See Daniel Lumber Co. v. Empresas Hondurenas, S.A., 5 Cir. 1954, 215 F.2d 465, cert. den., 1955, 348 U.S. 927, 75 S. Ct. 340, 99 L.Ed. 727; Liechti v. Roche, supra note 1, 198 F.2d at 177 (fn. 2 and accompanying text). Miller, supra note 1, at 689. See also Mexican National R. R. Co. v. Slater, supra note 1 (a reversal on foreign law) and Nicholas E. Vernicos

Shipping Co. v. United States, 2 Cir. 1965, 349 F.2d 465. Cf. Eastern Bldg. & Loan Assoc. v. Williamson, 1903, 189 U.S. 122, 126–127, 23 S.Ct. 527, 47 L.Ed. 735, 746 (at a time when laws of sister states were similar to "foreign law"); Davis v. Parkhill-Goodloe Co., 5 Cir. 1962, 302 F.2d 489, 491 ("controlling substantive principles" under Jones Act not subject to "clearly erroneous" rule); Nolan v. Sullivan, 3 Cir. 1967, 372 F.2d 776, 778 (conclusion as to contributory negligence not subject to "clearly erroneous" rule); Gediman v. Anheuser Busch, Inc., 2 Cir. 1962, 299 F.2d 537, 547 (conclusion as to negligence). For general analyses of the "clearly erroneous" rule —which would eliminate the need for such a standard of review in this case— see Galena Oaks Corp. v. Scofield, 5 Cir. 1954, 218 F.2d 217, 219–220 and E. H. Sheldon & Co. v. C. I. R., 6 Cir. 1954, 214 F.2d 655, 658–659.

3. Liechti v. Roche, supra note 1; Daniel Lumber Co. v. Empresas Hondurenas, S.A., supra note 2; Bostrom v. Seguros Tepeyac, S.A., N.D.Tex.1963, 225 F. Supp. 222, 229 (at [9]). See also Jansson v. Swedish American Line, 1 Cir. 1950, 185 F.2d 212, 216 (at [2]) (citing Wigmore on Evidence).

date, and the district court's decision was rendered on August 11, 1966. The 1966 amendments to the federal rules provide that all rules taking effect on July 1, 1966, "shall govern all proceedings in actions brought thereafter and also in *all further proceedings, in actions then pending*, except to the extent that in the opinion of the court their application in a particular action then pending would not be feasible or would work injustice * * *." 28 U.S.C.A. Rule 86. (Emphasis added.) Under the facts of this case, we can hardly see how our acceptance of Rule 44.1 on appeal would work an injustice to either side; moreover, the trial court's decision contained the following recognition of the Rule and the proper procedure thereunder:

"Conclusions of Law
* * * * * *
3. In accordance with Rule 44.1, Federal Rules of Civil Procedure, the laws of Panama as stipulated by the parties are rulings of law and are as follows:
* * * [quoting Article 989, Article 23, and Article 9.]" 256 F.Supp. at 662–663.

## II. Article 989 of the Panama Commercial Code

■ Article 989 imposes obligations on two parties. First, it requires a bank to furnish accounts current to depositors "at least eight days after the end of each quarter or liquidation period agreed upon, requesting their written conformity thereof." There is no contention that the Bank failed to meet this responsibility. Second, Article 989 requires each depositor to present any comments concerning the accounts current "within five days." The next paragraph provides the only express sanction of the Article:

"Should a customer fail to reply within said period, his account will be held as admitted and the debit or credit balance shall be definitive as of the date of such account."

Our analysis focuses initially on the sanction. Without doubt the sanction is directed against only the depositor. The substance of the sanction is nearly as obvious; if activated, it prevents any contest of the accounts current presented to the depositor. The only indefinite item in the sentence [4] is the time of activation, and we cannot agree with the trial court that this lack of chronological precision renders the statute a nudum statutum.

■ The trial court discarded the sanction to Article 989 because the eight-day time limit on a bank and the five-day time limit on a depositor were ambiguous. This analysis seeks to prove too much— for example, whether "*at least* eight days after * * *" means "*within* eight days after * * *" and whether "within five days" refers to the mailing or to the receipt of the bank's statement. The words of Article 989 may be awkward, inelegant, or maladroit; but a common sense interpretation grants eight days within which to mail and five days after receipt to object.[5] Moreover, the spe-

---

4. Because the facts of this case do not raise any question of fraud by the bank or justifiable impossibility of performance, we do not need to consider here whether any such considerations may limit or modify the express sanction.

5. We refer to the maximum "noscitur a sociis," that a word is known by the company it keeps. Jarecki v. G. D. Searle & Co., 1961, 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859, 863. In the case at bar we find a reporting statute requiring notice "at least * * * *after*" an act. We should be able to infer a different interpretation of "at least" here

than when the notice must be given "at least * * * *before*" an act. See Douthitt v. Board of Trustees of Newcastle, 1931, 239 Ky. 751, 40 S.W.2d 335, 336 ("*At least* two weeks" publication of notice for a bond issue election meant "*not less* than two weeks.") Compare Miller v. State, 1923, 130 Miss. 564, 94 So. 706 ("*At least* four months" requirement as to maintenance of public schools meant that *school time* must "*not be less than* four months.") with Warren Mfg. Co. of Baltimore v. Hoffman, 62 Md. 165, 170. ("So as to make the fall [of a dammed stream] *at least* twelve feet at the common water mark' 'meant that the

cifics of the limitations periods are not vital to this case. No combination or permutation of days before us in this case and no rational or logical addition or subtraction from or to eight and five could yield any answer except the barring of the Depositor's relief. When a case arises in which time limits are in issue, we can and perhaps will reconsider the specifics. But we will not discard the plain substance of a statute because of theoretical and irrelevant ambiguities.

■ Most jurisdictions have a bank-protection statute such as Article 989. We quote from Brady, Bank Checks § 15.29 (page 561) (3rd Ed. 1962):

"§ 15.29. *Other statutes which may bar claim for forgery or alteration.* A word about 'final adjustment of statement of account statutes' is in order. Such statutes set a time limit from the time a bank statement is given to a customer after which the customer may not question the correctness thereof. Such a provision should bar a claim for payment of a forged or altered check or a check with a forged indorsement if the time limit has elapsed, although the 'final adjustment' statutes apply in all instances where the correctness of a bank statement is challenged."

The Depositor denies neither the existence of such statutes nor that a few states compel notice within thirty days. He contends, however, that the five-day period is unduly harsh, that the Uniform Commercial Code provides a one-year period,[6] and that even the Bank's statement specified ten days for reply. Thus, he concludes, the five-day period cannot be peremptory. We will not penalize the Bank for granting a period more liberal than that specified by statute. Moreover, we cannot ignore statutes merely because they are harsh. Harsh-

ness does not in itself constitute ambiguity.

Courts have consistently denied recovery to depositors who had failed to report discrepancies within the statutory period. Moreover, they have labeled such reporting requirements as substantive conditions precedent to recovery. Valley Nat. Bank of Phoenix v. Electrical Dist. No. 4, Pinal County, 1961, 90 Ariz. 306, 367 P.2d 655, 661 (statute applicable even if depositor is exempt from procedural statutes of limitations); G. Franklyn Fischer & Associates v. First Nat. Bank of Atlanta, 1960, 102 Ga.App. 567, 116 S.E.2d 902 (statute applicable even if bank promises special care in handling depositor's checks); Clyman v. Glasser [Marks] 1963, 39 Misc.2d 198, 240 N.Y.S.2d 532, 536–537 (statute applicable even if bank is in a fiduciary relationship with depositor). A few courts have required not merely general compliance but specific compliance. American Bldg. Maintenance Co. of Calif. Inc. v. Federation Bank & Trust Co., D.C.N.Y. 1963, 213 F.Supp. 412, 416–417 (general notice of forgery is not adequate if the statute requires a depositor to specify in detail the check or checks involved); Stauffer v. First Nat. Bank of San Antonio, Tex.Civ.App.1956, 291 S.W.2d 743, 745 (oral notice is not adequate if the statute requires written notice). At least one court has ruled that failure to report within the statutory time is a "complete defense" even though the depositor's agent for receiving the bank statement was a defrauder. Schwabenton v. Security National Bank of Greensboro, 1960, 251 N.C. 655, 111 S.E.2d 856, 858.

Court language has been consistent regardless of the period allotted by the applicable statute. (1) Two years. American Bldg. Maintenance Co. of Calif. v. Federation Bank & Trust Co., supra, and Rainbow Inn, Inc. v. Clayton Nat. Bank,

---

water must *"not exceed* twelve feet.") See, generally, "At Least" in Words and Phrases.

**6.** U.C.C. § 4–406(4). Note that the one-year period is a maximum and that the

depositor's negligence can preclude recovery even if he reports the disparity within one year. U.C.C. § 4.406.

1964, 86 N.J.Super. 13, 205 A.2d 753, 759 (in which case the court applied the statute despite certain ambiguities). (2) One year. Clyman v. [Marks] Glasser, supra, and Stauffer v. Frost Nat. Bank of San Antonio, supra. (3) Six months. Airco Supply Co. v. Albuquerque National Bank, 1961, 68 N.M. 195, 360 P.2d 386, 390 and Rainbow Inn, Inc. v. Clayton Nat. Bank, supra. (4) Sixty days. G. Franklyn Fischer & Associates v. First Nat. Bank of Atlanta, supra.[7] Moreover, in cases involving contractual reporting requirements set out in bank passbooks or other bank statements, courts have required notice within shorter periods. (1) Thirty days. Hammerschlag Mfg. Co. v. Importers' and Traders' Nat. Bank, 2 Cir. 1919, 262 F. 266, 274. (2) Ten days. Brunswick Corp. v. Northwestern Nat. Bank & Trust Co. of Minneapolis, 1943, 214 Minn. 370, 8 N.W.2d 333, 336 (action barred after ten days even though depositor's accountant was fraudulent) and Whitney Trust & Savings Bank v. Jurgens-Fowler Co., 1934, 180 La. 445, 156 So. 460, 462.

■ We are construing a solemn statute with a discernible intention to limit the period of bank liability. Although we may question the equities in a five-day notice requirement, we cannot assume a legislative role and deny the statute's vitality. Cf. West Side Bank v. Marine Nat. Exchange Bank, Wisc. January 30, 1968, 37 Wis.2d 661, 155 N.W.2d 587 (requirements of posting under U. C.C. § 4–109). To do so would be to violate Article 9 of the Civil Code of Panama, quoted supra, as well as to ignore prior court decisions. Green v. King Edward Employees' Federal Credit Union, 5 Cir. 1967, 373 F.2d 613, 616 ("the cardinal rule of statutory construction that effect should be given to all of the provisions of a statute, if reasonably possible"); Florentine v. Church of Our Lady of Mt. Carmel, 2 Cir. 1965, 340 F.2d 239, 241–242 ("what is clear from the text of Article 7 cannot be ob-

scured by reliance on the ambiguous general purpose clause"); Rainbow Inn, Inc. v. Clayton Nat. Bank, supra, 205 A. 2d at 759–760 (in which case the court applied bank protection statute after an extensive analysis of ambiguities). Cf. United States v. Braverman, 1963, 373 U.S. 405, 408, 83 S.Ct. 1370, 10 L.Ed.2d 444 (refusal to "interpret a statute so narrowly as to defeat its obvious intent").

We have examined the trial testimony of the experts on Panamanian law and have found no effective refutation of our determination. We conclude that the District Court's interpretation of Panamanian law was erroneous.

The judgment is reversed.

---

7. In 1962 Georgia adopted the Uniform Commercial Code and expanded the period to one year. Ga.Code Ann. 109A-4-

406. See Citizens & Southern Nat. Bank v. American Surety Co. of N.Y., 5 Cir. 1965, 347 F.2d 18, 21 (at fn. 1).